UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

NICHOLAS TYLER,                                  )
                                                 )
                              *Plaintiff,*        )
                                                 )
              vs.                                )        No. 1:21-cv-02137-JMS-TAB
                                                 )
CAPSTONE LOGISTICS, LLC,                         )
                                                 )
                              *Defendant.*        )

**<u>ORDER</u>**

Plaintiff Nicholas Tyler initiated this lawsuit against his current employer, Capstone

Logistics, LLC ("Capstone"), alleging that he was discriminated against because of his race.

[Filing No. 1.] Capstone has filed a Motion for Summary Judgment, seeking judgment in its favor

on all of Mr. Tyler's claims. [Filing No. 34.] After briefing on the Motion for Summary Judgment

concluded, Mr. Tyler filed a Motion to Strike Declaration Testimony Along with Portions of

Defendant's Reply Brief, or alternatively, To Reopen Discovery and to Allow the Filing of a

Surreply Brief ("Motion to Strike"). [Filing No. 45.] These motions are ripe for the Court's

decision.

**I.**
**SUMMARY JUDGMENT STANDARD**

A motion for summary judgment asks the Court to find that a trial is unnecessary because

there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court

what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson*

*v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). "'Summary judgment is not a time to be

coy.'" *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of*

1

*Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those

facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### STATEMENT OF FACTS[1]

With the caveat that both parties raise evidentiary challenges that are addressed below, the following factual background is set forth pursuant to the standard discussed above.  The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence—as supported by the record—are presented in the light most favorable to "the party against whom the motion under consideration is made."  *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.  Capstone's Operations

Capstone is a logistics company that provides warehouse services including unloading, salvage, and sanitation services to partner companies.  [Filing No. 35-1 at 10.]  This lawsuit concerns a Capstone facility in Indianapolis, Indiana ("the Facility"), which provides services to Kroger.  [Filing No. 35-2 at 12-13.]

The Facility is managed by two Site Supervisors, one on day shift and one on night shift, who report directly to a single Site Manager.[2]  [Filing No. 35-3 at 18.]  The Site Manager is the

---

[1] At the outset, the Court notes that Capstone failed to comply with the Court's Practices and Procedures, which explicitly provide that evidence submitted in support of a motion for summary judgment must be filed before the supporting brief so that all citations to the evidence can be made using the docket numbers of the previously filed exhibits.  [*See* Filing No. 5 at 3.]  This has made the Court's review of the evidence unnecessarily cumbersome.  Counsel is cautioned that the Practices and Procedures must be followed in this case and in all other cases going forward.

[2] The record often refers to the positions of Site Supervisor as "Warehouse Supervisor" and Site Manager as "Warehouse Manager" or "Warehouse Operations Manager."  However, the parties seem to agree that "Warehouse" and "Site" are used interchangeably, and the important distinction

head of the management team at each site.  [Filing No. 35-1 at 10.]  The Site Manager reports directly to the Director of Operations.  [Filing No. 35-1 at 10; Filing No. 35-3 at 30.]  The Director of Operations, in turn, reports to the Vice President of Operations.  [*See* Filing No. 35-1 at 16-17.]

During the timeframe relevant to this lawsuit, Josh Hiatt was a Vice President of Operations at Capstone, supervising approximately 65 to 70 Capstone facilities that provided services to Kroger, including the Facility.  [Filing No. 35-2 at 11.]  Mr. Hiatt had ten direct reports, including Justin Watkins, who was the Director of Operations covering numerous Capstone facilities, including the Facility.  [Filing No. 35-1 at 14-18; Filing No. 35-2 at 11; Filing No. 35-3 at 36.]  Mr. Hiatt was the ultimate decisionmaker for hiring and bonuses, but he accepted input and recommendations from Mr. Watkins.  [Filing No. 35-2 at 34-35; Filing No. 35-2 at 37-38.]  Mr. Hiatt is white.  [Filing No. 35-3 at 70.]  Mr. Watkins is African American.  [Filing No. 35-3 at 37.]

Mr. Watkins, who himself was a Site Manager for about four years before becoming a Director of Operations, testified that the job of Site Supervisor is "very, very similar" to the job of Site Manager, and the only practical difference in their duties is that the Site Manager also oversees the Site Supervisors.  [Filing No. 35-1 at 14; Filing No. 35-1 at 19; Filing No. 35-1 at 22.]  Mr. Tyler disputes this characterization, and contends that Site Supervisor and Site Manager are two distinct jobs and that the Site Manager performs duties that the Site Supervisors do not perform. [*See* Filing No. 38-1 at 2.]

In addition to their base salaries, Site Managers and Site Supervisors each receive quarterly bonuses based on the Facility's financial performance ("Revenue Bonuses").  [Filing No. 35-3 at 32-33.]  If the Facility's revenue exceeds a certain threshold, the Site Manager receives 10% of the

---

is between "Supervisor," which is lower in the hierarchy, and "Manager," which is higher in the hierarchy.  [*See* Filing No. 39 at 3 nn.1-2.]  In the interest of clarity, the Court will use only "Site Supervisor" and "Site Manager" in this Order.

excess as a bonus, while each Site Supervisor receives 5% of the excess as a bonus.  [Filing No. 35-3 at 32-33.]

**B.  Mr. Tyler's Early Employment at Capstone**

Mr. Tyler is African American.  [Filing No. 35-3 at 85.]  He was hired at Capstone in 2016 to work as a freight handler at the Facility.  [Filing No. 35-3 at 14.]  Prior to Capstone, Mr. Tyler worked for three or four years as a night shift supervisor of the Sanitation Department at Indianapolis Fruit Company.  [Filing No. 35-3 at 10-11.]  Prior to that, he worked at a temp agency and was placed in positions at a Target warehouse and an airport.  [Filing No. 35-3 at 12.]

Mr. Tyler was promoted to a "lead" position at the Facility in 2017, and shortly thereafter was promoted to a Site Supervisor position on the day shift.  [Filing No. 35-3 at 20-23.]  Before being promoted to Site Supervisor, however, Mr. Tyler was required to apply for the position through Capstone's job application portal, which required him to fill out an application and submit a resume.  [Filing No. 35-3 at 35-36.]  Around the same time that Mr. Tyler became the day shift Site Supervisor, Eric Martin was hired as the Site Supervisor on the night shift.  [Filing No. 35-3 at 24.]  Mr. Martin is white.  [Filing No. 35-3 at 25.]  When Mr. Tyler started as a Site Supervisor, his base salary was $40,000, but it was eventually increased to $48,000.  [Filing No. 35-2 at 32; Filing No. 35-3 at 24.]

Mr. Tyler testified that, as a Site Supervisor, he was responsible for: managing employees to ensure they arrived on time and complied with safety procedures; recruiting, interviewing, and hiring employees; training employees; and communicating and meeting with Kroger representatives and other partners.  [Filing No. 35-3 at 25-29.]  He testified that although he had the authority to discipline employees, he could not fire them.  [Filing No. 35-3 at 31-32.]  Mr.

Watkins testified that Mr. Tyler was doing the work of a Site Supervisor competently.  [Filing No. 35-1 at 24.]

While Mr. Tyler was working as a Site Supervisor, Larry Smith, who was also a Site Supervisor, became the Site Manager of the Facility.  [Filing No. 35-3 at 30.]  Mr. Smith is white.  [Filing No. 35-1 at 23; Filing No. 35-3 at 30.]  In 2018, Mr. Smith was being paid a salary of $65,000 per year for the job of Site Manager.  [Filing No. 35-1 at 62.]  Mr. Watkins testified that he believes the salary initially offered to Mr. Smith was $60,000 per year, but Mr. Smith "renegotiated with his résumé and experience and got that knocked up to 65."  [Filing No. 35-1 at 63.]  Mr. Watkins stated that Mr. Smith "had already had management and supervisory experience prior to coming to Capstone."  [Filing No. 35-1 at 63; see also Filing No. 35-1 at 68 (Mr. Watkins testifying that Mr. Smith "had prior supervisor- and management-level experience that [Mr. Tyler] just didn't have").]  Mr. Hiatt also confirmed that employee salaries are based upon experience and the individual's salary history, and that Mr. Smith had more relevant experience than Mr. Tyler.  [Filing No. 35-2 at 40; see also Filing No. 35-2 at 36 ("Mr. Smith, I'm not sure if you have his resume, but compare it to Mr. Tyler's resume and I think you'd see a difference[.]").]

### C.  Mr. Smith Leaves the Facility, Resulting in an Open Site Manager Position, for which Capstone Ultimately Hires Doug Laura

Mr. Smith left his position as Site Manager of the Facility in May of 2020.  [Filing No. 35-2 at 18.]  According to Mr. Watkins, when Mr. Smith left, Mr. Tyler, Mr. Watkins, and Mr. Martin worked together to cover the duties of the Site Manager.  [Filing No. 35-1 at 26-28; see also Filing No. 35-1 at 66 (Mr. Watkins' deposition testimony: "Q: So not all of [Mr. Smith's] job duties fell in the Plaintiff's lap, correct?  A: Yes.").]  Similarly, Mr. Hiatt testified that Mr. Tyler, Mr. Watkins, and Mr. Martin worked together to cover the Site Manager duties.  [See Filing No. 35-2 at 28 (Mr. Hiatt's deposition testimony: "Q: . . . [F]rom the time Larry Smith left till Doug Laura started, I

want to know who you consider to have done the job of site manager at that location.   A: A combination of associates.  Q: Who were those associates? A: Justin Watkins, Nicholas Tyler, Eric [Martin]. That would be the primary three.").]  When asked if Mr. Tyler was doing the same work on an interim basis that Mr. Smith did as the Site Manager, Mr. Watkins said no.  [Filing No. 35-1 at 46-47.]  Specifically, Mr. Watkins explained that Mr. Smith "ran the site in its totality over the day shift and the night shift operations," while Mr. Tyler was only present during the day shift and did not oversee the night shift operations.  [Filing No. 35-1 at 47.]  Instead, Mr. Watkins, Mr. Martin, and "other leads that were on-site" were sharing the night shift duties of the Site Manager in Mr. Smith's absence.  [Filing No. 35-1 at 48.]  Mr. Watkins acknowledged that Mr. Tyler likely received work-related phone calls during the night, but he stated that he and Mr. Martin also received phone calls at all hours of the day and night.  [Filing No. 35-1 at 48.]

Mr. Tyler, however, denies that either Mr. Watkins or Mr. Martin covered any of the Site Manager duties, and instead maintains that he handled those duties all by himself once Mr. Smith left.  [Filing No. 35-3 at 42-43.]  He contends that he was "performing the work of two distinct positions"—the Site Supervisor and the Site Manager.  [Filing No. 38-1 at 2.]

Regardless, Mr. Tyler expressed interest in formally taking over the Site Manager position left vacant by Mr. Smith.  [Filing No. 35-1 at 29-30; Filing No. 35-2 at 18.]  After looking at Mr. Tyler's resume, Mr. Watkins was not sure whether Mr. Tyler had the necessary qualifications to become a Site Manager and suggested that, to support his candidacy for the promotion, Mr. Tyler demonstrate that he could successfully operate the facility on his own by completing a trial run as the Site Manager.  [*See* Filing No. 35-1 at 30 (Mr. Watkins testifying: "I said to him that after looking at his résumé and some of the other qualifications that he didn't have, that one of the best things for him would be to have the site running well with him in control of the site and that would,

you know, help him throughout the interviewing process. . . . He had to sell himself to not only myself but to a senior director as well as a VP, and just to be honest, he sent me a résumé that was not the quality of what a site manager would be expected to turn in."); *see also* [Filing No. 35-3 at 39](#) (Mr. Tyler testifying: "He told me in order to get that role I had to show myself; I had to do the job and show that I'm capable of doing the job before I can be promoted to that job."; [Filing No. 35-3 at 41](#) (Mr. Tyler stating "I went in [to the interim Site Manager role] knowing that I was going to prove myself the first couple months or whatever.").]

Mr. Watkins stated during his deposition that "[i]t's not an unfamiliar concept" to require candidates for promotions to perform their desired job on a trial basis before being promoted, although he could not recall any specific instances of any employee being required to work on a trial basis for more than 60 days. [[Filing No. 35-1 at 63-64](#).]  Mr. Hiatt also testified that it is common for candidates for internal promotions to participate in a trial period, and there have been instances in which the trial period has lasted for six months. [[Filing No. 35-2 at 19-20](#).]  Mr. Tyler contends that he is not aware of any other Capstone employee having to complete a trial run before being a Site Manager, and he maintains that Mr. Smith never had to do a trial run. [[Filing No. 38-1 at 2](#).]  He also testified that Ron Hampton, who is African American and was the Site Manager before Mr. Smith, did not have to do a trial run. [[Filing No. 35-3 at 22](#); [Filing No. 35-3 at 92](#).]

According to Mr. Watkins, after having taken on some Site Manager duties during the trial run period, Mr. Tyler expressed that he no longer wanted the Site Manager job, and Mr. Watkins relayed that message to Mr. Hiatt. [[Filing No. 35-1 at 31](#); [Filing No. 35-1 at 33](#).]  Mr. Hiatt also testified that he believed that Mr. Tyler had withdrawn his name from consideration for the Site Manager job. [[Filing No. 35-2 at 15-16](#); [Filing No. 35-2 at 21](#).]  However, Mr. Tyler denies that

he ever told Mr. Watkins that he no longer wanted the position.  [Filing No. 35-3 at 54-55; *see also* Filing No. 38-1 at 3.]

According to Mr. Tyler, performing the duties of Site Manager and Site Supervisor during his trial run period was stressful.  [Filing No. 38-1 at 3.]  He alleges that he received work-related calls "constantly" during his off-hours, and the stress was "so serious that it became the subject of concern to [him], [his] wife and other family members." [Filing No. 38-1 at 2.]  Mr. Tyler's brother was "so worried about [Mr. Tyler's] mental state that he agreed [to pay] for psychological counseling sessions." [Filing No. 38-1 at 2.]  Mr. Tyler saw a counselor in remote, online sessions "at least weekly for approximately six months." [Filing No. 38-1 at 2.]

Mr. Watkins did not initially promise any additional compensation related to the trial run. [Filing No. 35-3 at 41.]  However, according to Mr. Tyler, sometime later, Mr. Watkins said that "he would get [Mr. Tyler] paid for the work that [he] was doing" and that his next yearly bonus would be "the biggest bonus of [his] career." [Filing No. 35-3 at 41.]  In 2020, Mr. Tyler received three bonuses—separate from his ordinary Revenue Bonuses—totaling $2,500.  [Filing No. 38-1 at 3.]  Payroll records note that Mr. Tyler was paid these bonuses because he worked as the Site Manager.  [Filing No. 38-3 at 14-16.]  Mr. Martin was not paid any such bonuses.  [Filing No. 35-1 at 42.]

Mr. Watkins testified that he recommended that Mr. Tyler receive these bonuses, and Mr. Hiatt approved the bonuses.  [Filing No. 35-1 at 66.]  According to Mr. Watkins, Mr. Tyler was given bonuses while Mr. Martin was not because Mr. Tyler was present at the Facility during the day and represented Capstone at various meetings with partners that took place during daytime hours, while Mr. Martin, who worked the night shift, was not involved in any such meetings. [Filing No. 35-1 at 42-43.]

Mr. Tyler formally applied for the open Site Manager position through Capstone's job portal in August of 2020.  [Filing No. 38-1 at 2.]  He stated in the declaration filed along with his response to Capstone's Motion for Summary Judgment that he filed this formal application because he asked Mr. Watkins why he had not yet been promoted to Site Manager despite having been doing the job on a trial basis, and Mr. Watkins informed him that a formal application was needed. [Filing No. 38-1 at 2.]  Mr. Tyler alleges that he was "shocked" to hear that a formal application was necessary, as he believed he "had already accomplished making such an application through [Mr.] Watkins, as [he] was doing the job of Site Manager as [Mr.] Watkins had directed [him]." [Filing No. 38-1.]

Mr. Tyler later received a notification from Capstone's portal indicating that he did not get the Site Manager job.  [See Filing No. 35-3 at 56-59.]  The notification stated that Mr. Tyler was not selected because his background was not a match for the requirements of the Site Manager position.  [Filing No. 35-3 at 59; Filing No. 38-2 at 1.]  Mr. Tyler testified that, even after receiving this notification, he was still performing the duties of Site Manager because Mr. Watkins was still leading him to believe that he might get the position if he performed well.  [Filing No. 35-3 at 59-60.]

In November of 2020, Doug Laura was hired to fill the Site Manager position left vacant by Mr. Smith.  [Filing No. 35-1 at 31.]  Mr. Laura is African American.  [Filing No. 35-1 at 65; Filing No. 35-3 at 63.]  Mr. Laura's resume indicates that he has over 30 years of "warehouse and materials management experience," including experience in shipping and receiving, logistics, warehouse distribution, supply chain, and warehouse management.  [Filing No. 55-1 at 2-3.]  Mr. Laura's base salary as Site Manager was $70,000.  [Filing No. 35-10 at 3.]  Mr. Laura did not have to complete a trial run before being officially hired as Site Manager.  [Filing No. 35-3 at 92.]

Mr. Tyler testified that he learned that Mr. Laura was hired when Mr. Laura and Mr. Watkins came to visit the Facility.  [Filing No. 35-3 at 62-63.]  When asked if he had any discussions with Mr. Watkins regarding why Mr. Laura was hired, Mr. Tyler said no.  [Filing No. 35-3 at 63 ("Q: Did you have a discussion with [Mr. Watkins] then about why [Mr. Laura] was hired, what was going on? A No, ma'am.  Q: Any reason that you didn't discuss that with [Mr. Watkins]?  A: Wasn't no reason to.  Q: I thought you just testified that you understood you were still in the running, you were gonna get the [Site Manager] position, and then you just out of the blue found out you didn't. Right?  A: Yes, ma'am.  Q: Okay. So, you still didn't talk to [Mr. Watkins] about that?  A: I just continued to do my job.").]  According to Mr. Tyler, he had to train Mr. Laura on how to be a Site Manager.  [Filing No. 38-1 at 3.]  Mr. Tyler also maintains that he continued to perform the duties of a Site Manager, in addition to his regular Site Supervisor duties, despite the fact that Mr. Laura was supposed to be the Site Manager.  [Filing No. 38-1 at 3.]

**D.  Mr. Laura Leaves the Facility, Resulting in an Open Site Manager Position, to which Capstone Ultimately Promotes Mr. Tyler**

Mr. Laura was transferred from the Facility to another Capstone facility in April 2021.  [Filing No. 35-4 at 3; Filing No. 38-1 at 3.]  According to Mr. Tyler, after Mr. Laura left, he continued to do all of the Site Manager duties, in addition to his Site Supervisor duties, in hopes that he would finally be officially promoted to Site Manager.  [Filing No. 38-1 at 3.]  Mr. Watkins testified that after Mr. Laura left, the Site Manager duties were covered by Mr. Watkins, Mr. Tyler, and Mr. Martin, "with [Mr. Tyler] definitely taking more of a role because of the hours that he was working."  [Filing No. 35-1 at 41.]

Mr. Tyler testified during his deposition that he submitted a formal application and resume for the Site Manager position through Capstone's job portal, [Filing No. 35-3 at 66], though he later stated in his declaration that he was not required to submit any such application, [Filing No.

38-1 at 3].  Regardless, Mr. Tyler went through several interviews, [Filing No. 35-3 at 65-68], and was promoted to Site Manager on July 4, 2021, [Filing No. 35-3 at 70; Filing No. 38-1 at 4-5]. His base salary in that position is $60,000 per year.  [Filing No. 35-3 at 70-71.]

### E.  This Lawsuit

Mr. Tyler initiated this lawsuit on July 29, 2021, alleging discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981.  [Filing No. 1.]  Specifically, he asserts two theories of discrimination under each provision: (1) that he was forced to perform the job of Site Manager for a period of approximately 14 months (*i.e.*, from the time Mr. Smith left in May of 2020 until Mr. Tyler was ultimately promoted in July of 2021) while receiving discriminatory pay that was less than what Mr. Smith was paid while he was working as Site Manager; and (2) Mr. Tyler was denied a promotion for a period of 14 months.  [*See* Filing No. 39 at 2-3.]  Capstone seeks judgment in its favor on all of Mr. Tyler's claims.  [Filing No. 34.]

### III.
### EVIDENTIARY OBJECTIONS

### A.  Mr. Tyler's Declaration

In its Reply in Support of its Motion for Summary Judgment, Capstone requests that the Court strike Mr. Tyler's declaration, which he filed along with his response brief.  [Filing No. 43 at 14-17.]  Specifically, Capstone argues that Mr. Tyler's declaration contradicts his deposition testimony and other documentary evidence, and it points to several examples of what it believes to be inconsistencies or inaccuracies in the declaration, including that: (1) Mr. Tyler wrote in his declaration that he was not required to submit a formal application for the Site Manager position in 2021, after Mr. Laura left, while he stated in his deposition that he did submit such an application; (2) Mr. Tyler characterizes the notification he received that his 2020 application for

the Site Manager position had been rejected as a "text message," although his deposition states that he had to log in to Capstone's careers portal to view the rejection; and (3) the declaration states that Mr. Tyler received $3,500 in bonuses, while other evidence demonstrates that he received $2,500 in bonuses.  [Filing No. 43 at 14-17.]  Capstone contends that "[Mr. Tyler's] Declaration manages to misstate and contradict almost every single piece of relevant information to which he previously testified under oath," and therefore the Court should strike it from the record, decline to consider it, and "consider further sanctions" for Mr. Tyler's attempt to create issues of material fact using misstatements.  [Filing No. 43 at 17.]

In response, Mr. Tyler asserts that Capstone is "desperate" to throw out his declaration because it creates disputes of material fact that preclude summary judgment, and the "depth of its desperation is revealed when the points discussed by Capstone are examined."  [Filing No. 50 at 1-2.]  Mr. Tyler contends that Capstone failed to reference the most recent applicable caselaw from the Seventh Circuit, which he asserts directs courts not to strike declarations or affidavits based on inconsistencies.  [Filing No. 50 at 2.]  Mr. Tyler also argues that each of the alleged inconsistencies pointed out by Capstone are either not true inconsistencies, not based on accurate characterizations of his deposition testimony, or are the result of inadvertent errors.  [Filing No. 50 at 3-7.]

Capstone replies that "[t]he Court is well-equipped to review [Mr. Tyler's] deposition and the declaration and decide for itself whether the testimony is inconsistent," and "[f]or this reason, Capstone deems it an unproductive exercise to attempt to address each paragraph in [Mr. Tyler's] Response to Capstone's request."  [Filing No. 51 at 8.]  Capstone reiterates its contention that Mr. Tyler's "counsel drafted a self-serving declaration to avoid summary judgment after seeing Capstone's brief, and [Mr. Tyler] either did not review it before signing or reviewed it so poorly

that he failed to catch a litany of inconsistencies," and "[t]he result is a sham declaration which has no basis in [Mr. Tyler's] testimony or the truth." [Filing No. 51 at 8.]

"[E]very federal court of appeals permits a judge to disregard a 'sham' affidavit—typically an affidavit that contradicts prior deposition testimony." *James v. Hale*, 959 F.3d 307, 315 (7th Cir. 2020). "In this circuit the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony. . . . The organizing principle of our sham-affidavit practice is simply stated: a *genuine* issue of material fact cannot be conjured out of nothing." *Id.* at 316 (emphasis original) (citations omitted). There are three recognized exceptions to the sham-affidavit rule, and a court may consider an affidavit or declaration that contradicts prior testimony if: (1) the affidavit contains newly discovered evidence; (2) the prior testimony is "demonstrably mistaken"; or (3) the affidavit "clarifies ambiguous or confusing deposition testimony." *Id.* at 317.

The Seventh Circuit has emphasized that the sham-affidavit rule should not be applied overzealously, stating:

> This principle must be applied with great care, . . . because summary judgment is not a tool for deciding questions of credibility. Few honest witnesses testify at any length without at least occasional lapses of memory or needs for correction or clarification. Disregarding as a sham every correction of a memory failure or variation in a witness's testimony requires "far too much from lay witnesses" and would usurp the trier of fact's role in determining which portion of the testimony was most accurate and reliable. That's why we have said an affidavit can be excluded as a sham only where the witness has given "clear answers to unambiguous questions which negate the existence of any genuine issue of material fact."

*Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571-72 (7th Cir. 2015) (internal citations omitted).

The Court has reviewed Mr. Tyler's deposition and declaration in their entirety, and disagrees with Capstone's characterization of these documents as significantly inconsistent. To the extent there are inconsistencies, they either appear to be unintentional or are not material to the

14

adjudication of Capstone's Motion for Summary Judgment.  The issue of whether Mr. Tyler did or did not submit a formal application for his promotion in 2021 is not dispositive for the reasons outlined in the analysis of his discrimination claims, below.  The statement in the declaration that Mr. Tyler's bonuses totaled $3,500 seems to be a scrivener's error, and that conclusion is bolstered by Mr. Tyler's response brief, in which he explicitly describes bonuses totaling $2,500 and never asserts that the bonuses totaled $3,500.  [*See* Filing No. 39 at 8-9.]  The characterization of the rejection notification as a "text message" is not only wholly unimportant, but also seems to be the product of Mr. Tyler's counsel's genuine misunderstanding that a message Mr. Tyler viewed on his smartphone, took a screenshot of, and sent to counsel is not the same thing as a text message. [*See* Filing No. 35-1 at 39 (Mr. Tyler's counsel questioning Mr. Watkins about the "text message"); Filing No. 35-2 at 24-27 (counsel questioning Mr. Hiatt about the "text message"); Filing No. 38-2 (titled "Screenshot of Application Rejection").]

The Court acknowledges the likelihood that Mr. Tyler's counsel was not careful in drafting the declaration, and Mr. Tyler was not careful in reviewing it before signing.  Certainly, this is not an advisable practice for either lawyer or client.  But the inconsistencies—to the extent that they exist—simply do not warrant striking the declaration from the record, as it is not the sort of "sham" the Seventh Circuit has recognized as improper.  To be sure, whether there is any truth to the statements contained in the declaration or in Mr. Tyler's deposition testimony remains an open question, but it is not a question for the Court to decide at this juncture.  And, for reasons explained more fully below, considering the declaration does not affect the disposition of the Motion for Summary Judgment.  Accordingly, Capstone's request to strike Mr. Tyler's declaration from the record is **DENIED**.

### B.  Mr. Tyler's Motion to Strike

Mr. Tyler's Motion to Strike asks the Court to strike from the record the declaration of Garrett Elrod ("the Elrod Declaration") and paragraph 7 of the supplemental declaration of Tracey Scott Dickinson ("the Dickinson Paragraph")—both of which were filed along with Capstone's Reply in Support of its Motion for Summary Judgment—as well as all portions of the Reply that refer to or rely on the Elrod Declaration or the Dickinson Paragraph.  [Filing No. 46 at 1.]  In the event that the Court declines to strike these materials, Mr. Tyler asks in the alternative that the Court reopen discovery to allow him to depose Mr. Elrod and Mr. Dickinson and then permit him to file a surreply brief.  [Filing No. 46 at 1-2.]  The Court addresses each of these issues in turn.

#### 1.  The Elrod Declaration

The Elrod Declaration contains the following information.  Mr. Elrod was the Senior Director of Operations over the Facility in 2018.  [Filing No. 43-1 at 2.]  In or around April of 2018, the Site Manager at the Facility was transferred to a new location, leaving the Site Manager position vacant.  [Filing No. 43-1 at 2.]  Mr. Tyler, Mr. Martin, and Mr. Smith were Site Supervisors at that time.  [Filing No. 43-1 at 2.]  Because he had prior management experience, Mr. Smith was assigned to fill in as interim Site Manager on a trial run basis.  [Filing No. 43-1 at 2.]  The trial run lasted four to five months, and during that time Mr. Smith retained the title of Site Supervisor and was paid his ordinary Site Supervisor salary; he was not paid the salary of a Site Manager.  [Filing No. 43-1 at 2-3.]  In September 2018, Mr. Smith was promoted to Site Manager.  [Filing No. 43-1 at 3.]  He was offered a salary of $60,000 per year, but requested $65,000 per year.  [Filing No. 43-1 at 3.]  His request for a higher salary was approved by Mr. Elrod and Mr. Hiatt because: (1) Capstone's partners had provided feedback indicating that Mr. Smith's "performance as interim Site Manager was very positive"; (2) Mr. Smith had prior

16

management experience outside of Capstone and had worked with other Capstone managers at a prior job; and (3) Mr. Smith "resided approximately one hour away from the Facility, resulting in an appreciably long commute." [Filing No. 43-1 at 3.]

Mr. Tyler argues that the Elrod Declaration should not be considered because Mr. Elrod was not disclosed as a person having potentially relevant knowledge in Capstone's initial disclosures, he was not listed in Capstone's preliminary witness list, and he was not listed in Capstone's answer to an interrogatory specifically asking for the identity of all witnesses. [Filing No. 46 at 2-3.] Mr. Tyler further contends that, although Mr. Elrod was listed as one of Mr. Tyler's potential witnesses in his initial disclosures, he was only intended to be a witness for topics specifically stated, including "the quality of [Mr.] Tyler's work, his application for the job denied him, the decision denying [Mr.] Tyler the job and his and other employees' rates of pay." [Filing No. 46 at 3.] Mr. Tyler contends that Capstone cannot argue that it did not know that it would need to rely on Mr. Elrod's testimony, because Mr. Tyler specifically stated in his deposition that one basis for his discrimination claims is that Mr. Tyler had to do a trial run while Mr. Smith did not. [Filing No. 46 at 4.] Accordingly, Mr. Tyler contends, Capstone is barred by Federal Rule of Civil Procedure 37 from relying on the Elrod Declaration in support of its Motion for Summary Judgment. [Filing No. 46 at 4; Filing No. 46 at 7-8.] Finally, Mr. Tyler asserts that the Elrod Declaration and the arguments relying on it should be struck because, by failing to include them in its initial brief, Capstone waived its right to present those arguments. [Filing No. 46 at 9.]

In response, Capstone argues that "[i]t was not until the August 2, 2022 settlement conference and [Mr. Tyler's] August 26, 2022 Response in Opposition to Capstone's Motion for Summary Judgment that Capstone truly learned of [Mr. Tyler's] theory of the case" or that Mr. Tyler intended to rely on Mr. Smith as a relevant comparator. [Filing No. 51 at 2 (internal citation

omitted).]  It argues that it believed the most relevant events were those that occurred after May 2020, when Mr. Tyler first expressed interest in becoming a Site Manager, and that "[t]here was no truly discernable reason for Capstone to investigate how or why [Mr.] Smith was promoted to the same position back in 2018." [Filing No. 51 at 3 (footnote omitted).]  Capstone also argues that Mr. Tyler would have had personal knowledge regarding Mr. Smith's trial run and promotion, given that Mr. Tyler was a Site Supervisor directly reporting to Mr. Smith during his time as interim Site Manager in 2018.  [Filing No. 51 at 4.]  Capstone argues that neither Mr. Elrod's identity nor his testimony are a surprise to Mr. Tyler, given: (1) Mr. Tyler's personal knowledge concerning Mr. Smith's promotion; (2) that Mr. Tyler identified Mr. Elrod as a potential witness; and (3) that, by incorporating all individuals listed in Mr. Tyler's initial disclosures into its own initial disclosures, it sufficiently identified Mr. Elrod for purposes of Federal Rule of Civil Procedure 26.  [Filing No. 51 at 4-5.]  Finally, Capstone argues that Mr. Tyler himself could have investigated Mr. Smith's promotion during discovery, made the affirmative decision not to do so, and then "surprised" Capstone with his arguments about Mr. Smith without ever having developed any evidence relating to those arguments.  [Filing No. 51 at 6.]

In reply, Mr. Tyler reiterates that he testified in his deposition that one of the bases for his discrimination claim is that Mr. Smith did not have to do a trial run before being promoted to Site Manager, and therefore Capstone was aware that evidence regarding Mr. Smith's promotion was relevant.  [Filing No. 54 at 2-4.]  Mr. Tyler contends that it was "illogical" for Capstone to assume that the relevant comparator was Mr. Laura, rather than Mr. Smith, and this erroneous assumption "caused it not to do the necessary discovery, and more importantly, not to disclose to [Mr.] Tyler purported witness testimony and documentation, which it now says the court should rely upon." [Filing No. 54 at 4.]  Mr. Tyler asserts that any argument that he had personal knowledge of Mr.

Smith's promotion because he witnessed it is pure speculation, and not evidence the Court can rely on to overcome Mr. Tyler's testimony that Mr. Smith did not have to complete a trial run.  [Filing No. 54 at 5.]  Mr. Tyler argues that he did not withhold any evidence during discovery and that he attempted to obtain information about Mr. Smith from Capstone by requesting Mr. Smith's personnel file, which "contain[ed] not one scrap of information to indicate what it has now included in the surprise Elrod declaration," and by propounding interrogatories in response to which Capstone did not identify Mr. Elrod.  [Filing No. 54 at 6-9.]  Mr. Tyler maintains that the Elrod declaration must be excluded.  [Filing No. 54 at 9.][3]

Rule 26 requires a party to disclose the name and contact information of "each individual likely to have discoverable information--along with the subjects of that information--that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  Fed. R. Civ. P. 26(a)(1)(A)(i).  The Rule further imposes a duty to supplement such disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1)(A).  "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).

---

[3] Intentionally omitted from the Court's summary of the parties' arguments concerning the Elrod Declaration and the Dickinson Paragraph is a significant number of exaggerated accusations and unnecessarily unflattering characterizations made by both parties' counsel against each other.  The Court acknowledges the role of a lawyer as zealous advocate, but encourages counsel to consider whether their repeated attempts to denigrate each other, rather than focusing on the substance of the issues, have been a helpful or productive use of their time, especially given that these disputes do not significantly impact the result in this case.

Exclusion of a witness's testimony is "automatic and mandatory," unless the party who failed to disclose that witness can demonstrate that its failure to disclose was either justified or harmless. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003) (quoting *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998)).  A court considering whether the disclosure was justified or harmless should consider: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *David*, 324 F.3d at 857 (citations omitted).

At the outset, the Court notes that both sides accuse each other of making illogical arguments concerning the Elrod Declaration, and in a sense both, of them are right to do so. Capstone's contention that it had no idea that Mr. Smith was a proposed comparator until after Mr. Tyler responded to the Motion for Summary Judgment is undermined by the fact that Capstone discussed Mr. Smith in its opening brief.  [*See* Filing No. 35 at 14 ("Specifically, Plaintiff alleges that Smith, a Caucasian, was paid more money for doing the same Site Manager job than Plaintiff was paid while covering some of the same Site Manager duties.").]  Further, Mr. Tyler mentioned Mr. Smith as a potential comparator during his deposition.  [*See* Filing No. 35-3 at 87 (Mr. Tyler testifying that his claims are based in part on the fact that "Larry Smith, a white man, was given more money for doing the job, the same job that I was doing.  And I was only given, what, $2,500."); Filing No. 35-3 at 91 (Mr. Tyler testifying that Mr. Smith was not required to complete a trial run before being hired as Site Manager).]  On the other hand, though, it is curious that Mr. Tyler—who maintains that Mr. Smith is the only appropriate comparator—does not appear to have explored in discovery the circumstances of Mr. Smith's promotion, as he has not presented much evidence to support his contention that Mr. Smith was treated more favorably than he was during

the promotion process.  And although he repeatedly asserts that he requested Mr. Smith's entire

personnel file in discovery, testimony of someone with personal knowledge of the situation—like

Mr. Elrod, who Mr. Tyler included on his own initial disclosures—would not be found in such a

file.

Setting these issues aside, the Court finds it unnecessary to decide whether Capstone's

disclosures adequately identified Mr. Elrod as a potential witness, and if not, whether the failure

to disclose him was either justified or harmless.  The Court is doubtful that exclusion of the Elrod

Declaration would be warranted on the facts presented here, but in order to save it from conducting

the full analysis of these issues, and because the Elrod Declaration would not change the result in

this case, the Court will simply **GRANT IN PART** Mr. Tyler's Motion to Strike, to the extent that

the Court will not consider the Elrod Declaration or Capstone's arguments relying thereon in

adjudicating the Motion for Summary Judgment.

## 2. *The Dickinson Paragraph*

Along with its Reply in Support of Motion for Summary Judgment, Capstone submitted a

supplemental declaration by Mr. Dickinson.  [Filing No. 43-2.] Mr. Tyler seeks to strike paragraph

7 of that declaration, which states:  "A review of the records [of applications for employment

submitted through Capstone's online recruiting portal] confirms an application for Larry Smith

was submitted on September 13, 2018 to Capstone's online recruiting portal regarding the Site

Manager position in the Indianapolis Kroger facility."  [Filing No. 43-2 at 3.]

In support of his Motion to Strike, Mr. Tyler asserts that the Dickinson Paragraph is

inadmissible under Federal Rules of Evidence 1002 and 1003 because Capstone has not produced

a copy of Mr. Smith's September 2018 application either during discovery or along with Mr.

Dickinson's supplemental declaration.  [Filing No. 46 at 5-6.]  Even if the testimony is not struck,

Mr. Tyler argues, it "simply creates yet another genuine issue of material fact whether that formal application was required to be made by the non-African-American, [Mr.] Smith, as it was required for African-American, [Mr.] Tyler." [Filing No. 46 at 6.] In addition, he contends that by failing to raise the arguments concerning Mr. Smith's alleged application in its opening brief, Capstone has waived its right to present those arguments. [Filing No. 46 at 9.]

Capstone responds, without much elaboration, that Mr. Dickinson's declaration is admissible because "it serves primarily to provide a foundation for and/or to authenticate exhibits," and, in any event, even if the Dickinson Paragraph is struck from the record, Capstone is still entitled to summary judgment on all of Mr. Tyler's claims. [Filing No. 51 at 7.]

In reply, Mr. Tyler reiterates that Mr. Smith's personnel file that was produced in discovery did not contain any formal application like the one referred to in the Dickinson Paragraph. [Filing No. 54 at 7-9.] He argues that the Dickinson Paragraph contains substantive testimony and does not merely authenticate records, and indeed the records in question were not produced at all. [Filing No. 54 at 9-10.]

As an initial matter, the Court agrees with Mr. Tyler that any argument by Capstone that the Dickinson Paragraph merely authenticates or lays the foundation for records misses the mark. The specific paragraph at issue contains the substantive statement that Mr. Smith filed a formal application in September 2018 for the Site Manager position, but the application itself is not provided. Regardless, without deciding whether the Dickinson Paragraph is admissible, and because the evidence contained in the Dickinson Paragraph is not material to the adjudication of Capstone's Motion for Summary Judgment, the Court without further discussion will **GRANT IN PART** Mr. Tyler's Motion to Strike, to the extent that the Court will not consider the Dickinson

Paragraph or Capstone's arguments relying thereon in ruling on the Motion for Summary Judgment.

## IV.
### MERITS OF MR. TYLER'S CLAIMS

**A.  Legal Standard for Discrimination Claims under Title VII and Section 1981**

Title VII forbids an employer from discriminating against any individual with respect to his or her "compensation, terms, conditions, or privileges of employment, because of such individual's race[.]" 42 U.S.C. § 2000e-2(a)(1).  Section 1981 ensures that "all persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a); *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1014 (2020).  The term "make and enforce contracts" encompasses "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," including employment contracts.  42 U.S.C. § 1981(b); *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 455 (2008).  Accordingly, Section 1981 also prohibits employment discrimination on the basis of race.  *See, e.g.*, *Mintz v. Caterpillar Inc*., 788 F.3d 673, 679 (7th Cir. 2015).  "The legal analysis for discrimination claims under Title VII and § 1981 is largely identical," *Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022), so the claims can be analyzed concurrently and cases interpreting either provision are instructive, *see also McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 788 (7th Cir. 2019) ("The legal analysis for discrimination claims under Title VII and § 1981 is identical, so we merge our discussion of these claims.").

To succeed on a discrimination claim under Title VII or Section 1981, the plaintiff must demonstrate: (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; and (3) causation.  *Lewis*, 36 F.4th at 759 (citation omitted).  With respect to

23

causation, Title VII requires the plaintiff to show that his race was "a motivating factor in the defendant's challenged employment decision." *Comcast*, 140 S. Ct. at 1017. Under Section 1981, on the other hand, the plaintiff must demonstrate that "race was a but-for cause of [his] injury." *Id*. at 1014.

"One way of proving employment discrimination is the familiar *McDonnell Douglas* burden-shifting framework." *Lewis*, 36 F.4th at 759 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under that framework, to establish a prima facie case of discrimination, the plaintiff must show that: (1) he is a member of a protected class; (2) he was meeting the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees who were not members of the plaintiff's protected class were treated more favorably. *Lewis*, 36 F.4th at 759 (citation omitted). If the plaintiff establishes each element of the prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action. *Id*. If the employer does that, the burden shifts back to the plaintiff to demonstrate that the employer's explanation is pretextual. *Id*. (citation omitted).

Although "the well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases," *Johnson v. Advoc. Health & Hosps. Corp*., 892 F.3d 887, 894 (7th Cir. 2018), it "is not the only method plaintiffs may use to prove their claim," *McDaniel v. Progress Rail Locomotive, Inc*., 940 F.3d 360, 368 (7th Cir. 2019). "However the plaintiff chooses to proceed, at the summary judgment stage the court must consider all evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse employment action because of [a protected characteristic]." *McDaniel*, 940 F.3d at 368 (internal quotation marks, emphasis, and citation omitted). "[T]he singular question that matters in a discrimination case" is whether "the evidence would permit a

24

reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Johnson*, 892 F.3d at 894 (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)); *see also Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021) ("Under *Ortiz*, we therefore ask whether the totality of the evidence shows discrimination, eschewing any framework or formula."). In answering this question, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz*, 834 F.3d at 765.

As noted above, Mr. Tyler's claims under Title VII and § 1981 are based on two theories of discrimination: (1) that Mr. Tyler was effectively forced to perform the job of Site Manager for a period of approximately 14 months while receiving discriminatory pay that was less than what Mr. Smith was paid while he was working as Site Manager; and (2) that Mr. Tyler was denied a promotion to Site Manager for a period of 14 months. The Court addresses each of these claims in turn.

### B. Discriminatory Pay Claim

In support of its Motion for Summary Judgment, Capstone relies on the *McDonnell Douglas* framework and argues that Mr. Tyler cannot establish a prima facie case of race discrimination regarding his compensation or his assignment of Site Manager duties while he was a Site Supervisor. [Filing No. 35 at 19-22.] Specifically, Capstone contends that the assignment of additional job duties perceived to be outside the scope of one's job description, without more, is not an adverse employment action. [Filing No. 35 at 19; Filing No. 35 at 21.] Capstone emphasizes that Mr. Tyler voluntarily took on Site Manager duties to prove he was worthy of a promotion, and he was compensated for those duties when he received bonuses totaling $2,500,

while Mr. Martin, who is white, received no bonuses for the Site Manager duties he performed after Mr. Smith left. [Filing No. 35 at 21-22.]  Capstone also argues that Mr. Tyler did not receive discriminatory pay compared to Mr. Smith because: (1) Mr. Smith was a Site Manager, while Mr. Tyler had the title of Site Supervisor, and it is undisputed that a Site Manager is above a Site Supervisor in the managerial hierarchy and therefore will always receive a higher salary, race notwithstanding; (2) Mr. Tyler admitted in his deposition that he understood he would not be paid the salary of a Site Manager until he was given that title; and (3) Mr. Smith was initially offered a $60,000 salary when he was promoted to Site Manager, but leveraged his prior experience to get a higher salary of $65,000, while Mr. Tyler was given a $60,000 salary when promoted to Site Manager, did not attempt to negotiate a higher salary, and did not have the same experience as Mr. Smith.  [Filing No. 35 at 19-21.]  Capstone points out that Mr. Tyler has not identified any similarly situated comparator outside of his protected class who filled in as interim Site Manager, while still retaining the title of Site Supervisor, who received more compensation than Mr. Tyler.  [Filing No. 35 at 21-22.]  Capstone further argues that, even if he could establish a prima facie case, Mr. Tyler cannot demonstrate that Capstone's proffered reasons for its actions are pretextual.  [Filing No. 35 at 22-24.]

In response, Mr. Tyler argues that he is not required to establish a prima facie case of discrimination or follow the *McDonnell Douglas* framework, and any contrary argument by Capstone misstates the applicable law.  [Filing No. 39 at 25-26.]  He also contends that there are numerous disputes of material fact that preclude summary judgment, including: (1) whether Mr. Tyler withdrew his name from consideration for the Site Manager position before Mr. Laura was hired; (2) whether Mr. Tyler performed all the duties of Site Manager from May to November of 2020 and from April to July of 2021 or whether Mr. Martin and Mr. Watkins also took on some of

those duties; (3) whether Mr. Watkins promised Mr. Tyler additional compensation, beyond the bonuses he received, to perform Site Manager duties; (4) whether Mr. Smith had management experience that justified his promotion to Site Manager or his higher Site Manager salary; (5) whether Mr. Tyler exercised the authority to hire and fire employees while he was serving as Site Manager on an interim basis; (6) whether Mr. Tyler performed Site Manager duties during the night shift from May to November 2020 or April to July 2021; (7) whether Mr. Tyler was required to file a formal application before being promoted to Site Manager; (8) whether Mr. Smith is an appropriate comparator; (9) whether Mr. Tyler questioned Mr. Watkins in August 2020 regarding why he was not promoted; (10) whether Mr. Tyler was required to do any work outside of his Site Supervisor job description while he was an interim Site Manager; and (11) whether there were complaints about Mr. Tyler's performance as either Site Supervisor or Site Manager.  [Filing No. 39 at 11-20.]  Mr. Tyler argues that Mr. Smith "was paid more than 95% more" for being a Site Manager than what Mr. Tyler was paid while he was a Site Supervisor performing all of the duties of Site Manager from May to November of 2020 and from April to July of 2021.  [Filing No. 39 at 22.]  He contends that Mr. Smith is a similarly situated comparator because he was doing the same work as Mr. Tyler, even though Mr. Tyler had not been formally given the title of Site Manager.  [Filing No. 39 at 23-24.]  He also argues that Mr. Smith "received better treatment" during his promotion to Site Manager because he "did not have to go through a lengthy 'prove yourself' trial period for almost no pay" and was not required to submit a formal application.  [Filing No. 39 at 28.]

In reply, Capstone contends that a reasonable factfinder could not conclude that Capstone paid Mr. Smith more than Mr. Tyler to do the same work on account of Mr. Tyler's race.  [Filing No. 43 at 3-7.]  Specifically, Capstone asserts that Mr. Tyler's argument that he was paid 95% less

than Mr. Smith "fails because [Mr. Tyler] is obviously comparing apples to oranges." [Filing No. 43 at 3.]   It argues that, to prove discriminatory pay, Mr. Tyler must either: (1) compare his compensation to Mr. Smith's while they were both Site Managers; or (2) compare his compensation to Mr. Smith's while they were both Site Supervisors performing Site Manager duties on an interim basis. [Filing No. 43 at 3-4.] Capstone further contends that the difference between Mr. Smith's $65,000 Site Manager salary and Mr. Tyler's $60,000 Site Manager salary was justified because Mr. Smith had prior management experience outside of Capstone. [Filing No. 43 at 5-6.] Capstone also emphasizes that Mr. Laura, who is African American, was paid a $70,000 base salary as Site Manager, further undermining Mr. Tyler's claims that any disparity in pay was based on race. [Filing No. 43 at 6.][4]

Mr. Tyler is correct that he is not required to utilize the *McDonnell Douglas* framework or establish a prima facie case of discrimination.  However, many of the factual disputes he identifies in his response are not material to his discriminatory pay claim.  Regardless, the standard of review requires that the Court accept the version of facts most favorable to Mr. Tyler.  To this end, the Court accepts Mr. Tyler's contention that he was performing all the duties of Site Manager plus all the duties of Site Supervisor from May to November of 2020 and from April to July of 2021, did not receive assistance from or share duties with any other Capstone employees, and during that time was paid his Site Supervisor salary plus his ordinary Revenue Bonuses plus $2,500 in additional bonuses.  The Court also accepts that Mr. Smith, while working as Site Manager, was paid a base salary of $65,000 plus higher Revenue Bonuses.[5]  The "singular question that matters,"

---

[4] Consistent with the ruling on Mr. Tyler's Motion to Strike, the Court has omitted from this summary (and from the summary of Capstone's arguments relating to the delayed promotion claim, below) any arguments based on the Elrod Declaration or the Dickinson Paragraph.

[5] Mr. Tyler asserts that Mr. Smith's compensation totaled approximately $76,000, [Filing No. 39 at 2], but it is not clear how he arrived at that number, and there does not appear to be any evidence

then, is whether there is any evidence from which a reasonable factfinder could conclude that this difference in pay was caused by Mr. Tyler's race. *See Johnson*, 892 F.3d at 894; *Ortiz*, 834 F.3d at 765. The Court finds that the answer to that question is no.

Mr. Tyler points to Mr. Smith as the relevant comparator, and while it is true that Mr. Smith was paid more than Mr. Tyler (both when Mr. Tyler was formally a Site Manager, and while Mr. Tyler was a Site Supervisor performing Site Manager duties), any inference that this disparity was racially motivated is negated by the undisputed fact that Mr. Laura, who is African American, was paid even more than Mr. Smith. Furthermore, while Mr. Watkins and Mr. Hiatt both testified that Mr. Smith had more relevant experience than Mr. Tyler, Mr. Tyler has pointed to no evidence contradicting such testimony or creating a genuine dispute as to Mr. Smith's qualifications. Mr. Tyler's contentions that Mr. Smith was generally treated more favorably—namely, that he was not required to do a trial run of the Site Manager position, and that he was not required to formally apply for the promotion from Site Supervisor to Site Manager—similarly fail to support an inference of racial discrimination. Neither Mr. Laura nor Mr. Hampton, who are both African American, were required to perform a trial run either, according to Mr. Tyler's own testimony. [*See* Filing No. 35-3 at 22; Filing No. 35-3 at 92; Filing No. 38-1 at 2.] Furthermore, Mr. Tyler acknowledges that he himself was not required to submit a formal application for his promotion after Mr. Laura left the Facility. [Filing No. 38-1 at 3.]

---

in the record concerning the amount of the Revenue Bonuses paid to Site Managers and Site Supervisors during the relevant times. It is similarly unclear why Mr. Tyler would compare that $76,000 figure to his $2,500 in additional bonuses, ignoring all of his other compensation. Furthermore, Mr. Tyler testified that his Site Supervisor base salary was raised during his time as Site Supervisor, but he did not specify exactly when, [*see* Filing No. 35-2 at 32], so it is not clear what Mr. Tyler's exact base salary was during the periods in question. This lack of clarity certainly is not helpful to the Court's analysis of the discriminatory pay claim, but it is undisputed that Mr. Smith was paid more as Site Manager than Mr. Tyler was paid during his periods of service as a Site Supervisor also performing Site Manager duties.

It is apparent that Mr. Tyler does not believe that the $2,500 in bonuses he received was adequate compensation for the additional duties he performed.  And he may be right.  But "the court is not a 'super-personnel department' intervening whenever an employee feels he is being treated unjustly," and an "aggrieved employee may seek recourse in federal court for discrimination only for the forbidden reasons set forth in Title VII," or in this case, Section 1981. *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 435-36 (7th Cir. 2005).  Mr. Tyler has not presented evidence that his pay, however inadequate he believed it to be, was the result of discrimination on the basis of race.

In sum, given all of these facts, even when viewed in the light most favorable to Mr. Tyler, there is nothing from which a reasonable factfinder could conclude that Mr. Tyler was discriminated against on the basis of race with respect to his pay.  Capstone's Motion for Summary Judgment, [Filing No. 34], is **GRANTED** as to that claim.

### C.  Delayed Promotion Claim

Capstone argues that Mr. Tyler cannot establish a prima facie case of discrimination based on the alleged failure to promote him in a timely manner because the position was awarded to Mr. Laura, who is in the same protected class as Mr. Tyler.  [Filing No. 35 at 16.]  In addition, Capstone contends that there is no evidence suggesting that the failure to promote Mr. Tyler was based on his race, given that: (1) Mr. Watkins and Mr. Hiatt believed that Mr. Tyler had withdrawn his name from consideration for the Site Manager position; (2) there is no evidence that Capstone had a history of failing to hire or promote African American employees, given that Mr. Watkins was a Site Manager and later promoted to a higher position, and Mr. Hampton and Mr. Laura were hired as Site Managers; and (3) Capstone had a preference for hiring or promoting Site Managers who had business or logistics degrees or warehouse management experience, which Mr. Tyler did not

have. [Filing No. 35 at 16-18.] Capstone argues that Mr. Smith is not a similarly situated comparator with respect to the delayed promotion claim because he had prior management experience. [Filing No. 35 at 18.] Furthermore, Capstone points out that, although Mr. Tyler contends that Mr. Smith was not required to do a trial run, neither were Mr. Hampton or Mr. Laura. [Filing No. 35 at 18.] Regarding the handling of Site Manager duties while a Site Supervisor, Capstone asserts that Mr. Tyler was treated more favorably than Mr. Martin, who is white and who did not receive additional bonuses for his efforts. [Filing No. 35 at 19.] Even if Mr. Tyler could establish a prima facie case of discrimination, Capstone argues, it has articulated legitimate, nondiscriminatory reasons for its decisions—namely that Mr. Tyler withdrew from consideration for the promotion and Mr. Laura was more qualified than Mr. Tyler in any event—and there is no evidence suggesting that these reasons are pretextual. [Filing No. 35 at 23.] Capstone emphasizes the fact that Mr. Tyler ultimately was promoted to the Site Manager position, which negates any potential inference that Capstone declined to promote him earlier based on his race. [Filing No. 35 at 23.]

In response, Mr. Tyler argues that several disputes of material fact preclude summary judgment, including those outlined in the section addressing his discriminatory pay claim, above. [Filing No. 39 at 11-20; Filing No. 39 at 26.] He maintains that he never withdrew his name from consideration for the Site Manager position. [Filing No. 39 at 27-28.] He further asserts that Mr. Watkins and Mr. Hiatt made "ambiguous statements," including: (1) claiming that Mr. Tyler was not performing all the duties of Site Manager during his trial period, while also claiming that the purpose of the trial period was to see whether Mr. Tyler could run the Facility on his own as the Site Manager; (2) claiming that he never did the full Site Manager job, while also asserting that he withdrew his name from consideration because he did not like the Site Manager job after he started

doing it on an interim basis; (3) paying him bonuses for his work as Site Manager, while claiming that he did not perform all the duties of Site Manager; and (4) claiming that Site Supervisors and Site Managers are functionally the same, while claiming that a trial run was necessary and failing to explain "why Capstone would be paying someone such as [Mr.] Smith a $65,000 a year salary[] when the work of his job as Site Manager[] was actually already being done by Site Supervisors." [Filing No. 29 at 28-31.]  In addition, Mr. Tyler asserts that Mr. Smith was treated more favorably than he was to the extent that he was not required to complete a trial period or submit a formal application before being promoted.  [Filing No. 39 at 28.]  Mr. Tyler argues that the fact that Mr. Laura was hired to the Site Manager position "does not cure the prior acts of discrimination," is not evidence of a lack of discriminatory animus towards Mr. Tyler, and "may actually serve as evidence that Capstone, through [Mr.] Hiatt, required [that] only African-Americans who possessed much greater experience and qualifications than did non-African-Americans, like [Mr.] Smith, should be allowed to have the Site Manager's job." [Filing No. 39 at 32-33.]  Finally, Mr. Tyler contends that the fact that he was eventually promoted is not dispositive and "might be important if it were not for two facts: 1) [Mr.] Tyler had already been doing the job for approximately 14 months, so the only change in July of 2021 is only that Capstone finally began paying him for the job, albeit $5,000.00 less per year than [Mr.] Smith; and 2) [Mr.] Tyler had, at that time, already filed his [Equal Employment Opportunity Commission ("EEOC")] charge of discrimination against Capstone and therefore a reasonable jury could conclude that Capstone only ever began paying him for the job of Site Manager in July of 2021 so that it could present this very defense to the Court." [Filing No. 39 at 34.]

In reply, Capstone argues that delaying a promotion, withholding a job title, assigning additional work perceived to be outside the scope of one's current job title, or paying unsatisfactory

bonuses relative to the work performed are not adverse employment actions. [Filing No. 43 at 7-9.] Capstone further argues that, because Mr. Tyler voluntarily took on additional responsibilities to prove himself worthy of a promotion, his trial run was not an adverse employment action. [Filing No. 43 at 9.] In any event, Capstone contends that Mr. Tyler has failed to produce evidence suggesting that he was denied a promotion for an extended period of time based on his race. [Filing No. 43 at 7-11.] Capstone emphasizes that Mr. Laura and Mr. Hampton were not required to complete trial runs, Mr. Watkins was promoted from Site Manager to Director of Operations, and Mr. Tyler was ultimately promoted to Site Manager. [Filing No. 43 at 9.] Capstone argues that Mr. Tyler cannot demonstrate that its proffered reasons for its conduct are pretextual, and even though Mr. Tyler denies withdrawing his name from consideration for the Site Manager position, it was not unreasonable for Mr. Watkins and Mr. Hiatt to believe that Mr. Tyler no longer wanted the position, and in any event, they decided to hire Mr. Laura, a more qualified African American candidate. [Filing No. 43 at 12-13; Filing No. 43 at 17-18.] Capstone contends that, by arguing that a jury could conclude that Capstone requires more of African Americans than non-African Americans who want to become Site Managers, Mr. Tyler effectively concedes that Mr. Laura was more qualified. [Filing No. 43 at 13.]

An adverse employment action is "'a materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017) (quoting *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000)) (alteration original). "Adverse employment actions include a broad array of actions such as 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or some other action causing a significant change in benefits.'" *McKenzie v. Milwaukee Cnty.*, 381 F.3d 619, 625 (7th Cir. 2004) (quoting *Burlington*

*Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).   "'While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action.'" *Nichols v. S. Illinois Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (quoting *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004)).   "Inconveniences and modest alterations of job responsibilities are not adverse employment actions." *McCurry v. Kenco Logistics Servs., LLC*, 942 F.3d 783, 789 (7th Cir. 2019).   However, "a significant delay in promotion can be an adverse employment action." *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 802 (7th Cir. 2014).

Relevant to this claim, Mr. Tyler argues that Capstone effectively forced him to perform the duties of a Site Manager while he retained the title of Site Supervisor and delayed in awarding him a formal promotion to the title of Site Manager and the corresponding increased compensation for a period of fourteen months.   [*See* Filing No. 39 at 3.]   Accepting Mr. Tyler's version of the facts as true, Capstone's assignment of additional duties without awarding a new title that would have resulted in an increase in compensation constituted a materially adverse change in the terms and conditions of Mr. Tyler's employment, for at least some period of time.[6]   The Court finds that

---

[6] The Court notes that it is not entirely accurate for Mr. Tyler to argue that his promotion was delayed for a period of fourteen months, given that Mr. Laura filled the Site Manager position for several months, that Mr. Tyler voluntarily agreed to some sort of trial run, and that the Seventh Circuit has recognized that some delay is expected between when a position becomes open and when a new person is promoted to that position, which in this case occurred twice.   *See Bannon v. Univ. of Chicago*, 503 F.3d 623, 628 (7th Cir. 2007) (concluding that a two-month delay in awarding the plaintiff a promotion was not an adverse employment action and explaining that "[e]mployees cannot expect to be promoted the instant they apply" because "[s]ome lag time has to be allowed for the application to work its way through the administrative process and for the employer to consider other candidates").   Regardless, the Court need not determine how long the promotion was delayed, as it is the period of delay coupled with the fact that Capstone assigned Mr. Tyler additional duties while withholding the corresponding elevated title and the financial benefits that would ordinarily accompany that title that form the adverse employment action in this case.

this constitutes an adverse employment action for purposes of Title VII and Section 1981. *See Alamo*, 864 F.3d at 552; *McKenzie*, 381 F.3d at 625; *Langenbach*, 761 F.3d at 802.

Turning to the issue of causation, the important question is whether there is evidence in the record from which a reasonable factfinder could conclude that Mr. Tyler's treatment was based on his race. *See Johnson*, 892 F.3d at 894; *Ortiz*, 834 F.3d at 765. Again, the answer to this question is no.

As the standard of review requires, the Court credits Mr. Tyler's version of the facts, including that he never expressly withdrew his name from consideration for the Site Manager position. Regardless, it is undisputed that: (1) Mr. Tyler was so stressed about taking on Site Manager duties that his family members were concerned about his wellbeing and he sought counseling; (2) Mr. Laura, who is African American, was hired to fill the Site Manager position left vacant by Mr. Smith's departure and filled that position for several months; and (3) Mr. Tyler was ultimately selected to fill the Site Manager position left vacant by Mr. Laura's departure.

Mr. Tyler relies on what he calls "ambiguous statements" by Mr. Watkins and Mr. Hiatt concerning the purpose of Mr. Tyler's trial run period, and whether or not he was performing all of the duties of a Site Manager during that period, essentially arguing that a jury could find that Mr. Watkins and Mr. Hiatt are being dishonest and that they were in fact motivated by racial animus. Setting aside the fact that Mr. Watkins is also African American, this argument relies on too many inferential leaps that would not be supported by the evidence. Mr. Tyler testified that neither Mr. Hampton nor Mr. Laura were required to complete trial runs. And Capstone does not contend that Mr. Tyler was not promoted the first time because his trial run went poorly. Regardless of whether anyone at Capstone believed that Mr. Tyler did not want to be considered for the position, Capstone hired someone else, Mr. Laura, who is also a member of the same

protected class as Mr. Tyler.  While Mr. Tyler is correct that hiring Mr. Laura does not definitively show a lack of discrimination, *see Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158-59 (7th Cir. 1996) (recognizing that "[a]n employee may be able to show that his race or another characteristic that the law places off limits tipped the scales against him, without regard to the demographic characteristics of his replacement," and stating that the fact that one's replacement is of a different race than the plaintiff "may help to raise an inference of discrimination, but it is neither a sufficient nor a necessary condition"), it is nonetheless a fact that the Court must consider along with the other evidence.  Mr. Tyler does not produce any evidence to contradict Capstone's evidence demonstrating that Mr. Laura had significant prior managerial experience, and the Court agrees with Capstone that Mr. Tyler effectively concedes that Mr. Laura was more qualified than he was.

It is also significant that Mr. Tyler was ultimately promoted to Site Manager in July 2021, which undermines any inference that his race was a motivating factor in withholding the promotion.  Although Mr. Tyler asserts that a jury could conclude that Capstone promoted him only because he had already filed a charge of discrimination with the EEOC, he has not pointed to any evidence upon which a reasonable jury could rely to support that conclusion.  The Complaint in this case states that Mr. Tyler filed his EEOC charge on September 2, 2021, [Filing No. 1 at 3], which is two months after he was promoted.  Further, Mr. Tyler produces no evidence that Mr. Watkins or Mr. Hiatt knew about the EEOC charge or that it in any way influenced their decision to promote Mr. Tyler.  At summary judgment, the Court considers only what a reasonable factfinder could infer based on the facts in the record, not every unreasonable or speculative inference that a party can muster in its briefing.

Based on the record currently before the Court, a reasonable factfinder could not reach the conclusion that Mr. Tyler was discriminated against because of his race with respect to the delay

in his formal promotion to Site Manager.   Accordingly, Capstone's Motion for Summary Judgment, [Filing No. 34], is **GRANTED** with respect to Mr. Tyler's discrimination claim relating to his delayed promotion.

### V.
### CONCLUSION

For the foregoing reasons, Mr. Tyler's Motion to Strike Declaration Testimony along with Portions of Defendant's Reply Brief, or Alternatively, to Reopen Discovery and to Allow the Filing of a Surreply Brief, [45], is **GRANTED IN PART** to the extent that the Court has not considered the Elrod Declaration, the Dickinson Paragraph, or any of Capstone's arguments relying thereon in ruling on summary judgment, and the motion is **DENIED IN PART** to the extent that the Court declines to strike those materials from the record or grant any of the alternative relief requested. Capstone's Motion for Summary Judgment, [34], is **GRANTED**.   Final judgment shall issue accordingly.

Date: 2/15/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

37